**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

ALIYA DAVIS,                    :
                                :
            Plaintiff,          :  CIVIL ACTION
                                :
      v.                        :  NO. 10-CV-03105
                                :
DAVIS AUTO, INC., and           :
TRI-STATE LENDING, LLC,         :
                                :
            Defendants.         :

**MEMORANDUM AND ORDER**

Joyner, C.J.                              November   22, 2011

        Before this Court are Defendants' Motion for Summary

Judgment (Doc. No. 20), Plaintiff's Response in opposition

thereto (Doc. No. 22), Defendants' Reply (Doc. No. 23) and

Plaintiff's Sur-Reply (Doc. No. 24). For the reasons set forth in

this Memorandum, the Court grants the Motion for Summary Judgment

and dismisses, with prejudice, Davis Auto, Inc. and Tri-State

Lending, LLC.

**FACTUAL BACKGROUND**

        This case involves Plaintiff Aliya Davis's claims against

her employers for discrimination in violation of Title I of the

Americans with Disabilities Act ("ADA"). Unless otherwise

indicated, the facts presented in this account are undisputed.

1

**Employment History**

Defendants Davis Auto, Inc. ("Davis Auto") and Tri-State Lending, LLC ("Tri-State") are two family-owned and operated businesses.  Davis Auto is a used automobile dealership located in Philadelphia. Until December 2008, Davis Auto operated a second used car location, Davis Motors, in Levittown, Pennsylvania. Joseph M. Davis, Jr. ("Davis, Jr.") serves as the President of Davis Auto; his father, Joseph M. Davis, Sr. ("Davis, Sr.") serves as the Vice-President. Davis, Sr. and Davis, Jr. together are the sole members of Tri-State, a Philadelphia company that purchases and services automobile loans, primarily from Davis Auto. William Bach ("Bach"), Davis, Sr.'s son-in-law and Davis, Jr,'s brother-in-law, manages the daily operations of Tri-State. Bach also serves as the Controller for both Davis Auto and Tri-State. Until April 2010, Davis Auto and Tri-State maintained a common payroll, and employees of both companies were paid from the Davis Auto payroll account. Davis Auto employees sometimes performed functions for Tri-State and vice versa.

Plaintiff Aliya Davis ("Plaintiff") (of no relation) worked at these businesses at various times and in various capacities from June 2006 until October 2008. Plaintiff worked at Davis Auto in a clerical position from the summer of 2006 until June 2007. Then from July 2007 until November 2007, she worked for Marlton

2

Auto Credit,[1] where she handled all the Davis Auto/Tri-State
Lending accounts. Around November 2007, Plaintiff stopped working
at Marlton Auto Credit and began receiving unemployment
compensation. From early December 2007 until February 2008,
Plaintiff also began working from home for Davis Auto and Tri-
State Lending, handling accounts as a collection clerk. On
February 18, 2008, Plaintiff returned to work full time as a
Collector/Clerk for Tri-State and reported directly to Bach as
her supervisor. She retained this position until she was
terminated on October 15, 2008.

**Medical History**

        During her employment with Defendants, Plaintiff suffered
from asthma, anxiety and a thyroid disorder. Plaintiff's
employers and co-workers admit they were aware of her health
ailments. However, the parties dispute the severity of these
conditions. For our current purposes, we set forth Plaintiff's
description of these impairments below.

        *(a) Plaintiff's Anxiety*

        In 2007, Plaintiff "blacked out" and ended up in a hospital
emergency room, where she remained for treatment for two to three
days. As a result of this incident, she was diagnosed with
anxiety and panic attacks. Stress, nerves and lack of sleep
trigger her anxiety, and as a consequence of her anxiety

_____

[1] Marlton Auto Credit is a separate entity located in New Jersey; the company
is neither owned nor managed by the Defendants.

3

Plaintiff suffers shortness of breath, sweating and claustrophobia. When Plaintiff suffers an anxiety attack her chest gets tight, which causes shortness of breath. Plaintiff takes Xanax as needed to control her anxiety and panic attacks.

### (b) Plaintiff's Asthma

Plaintiff has suffered from asthma her entire life. She takes Advair every day to treat her asthma, and uses an Albuterol[2] inhaler as needed. If neither medication provides sufficient relief, Plaintiff uses a nebulizer to open up her airways. She occasionally used a nebulizer to treat her asthma in the workplace. During bad flare ups, however, Plaintiff must go to the hospital where she can be given the steroid Prednisone.

### (c) Plaintiff's Thyroid Disorder

Plaintiff was diagnosed with thyroid nodules in 2000, and suffers from a condition more specifically referred to as a "multinodular goiter." This condition causes Plaintiff to suffer from nausea, vomiting and headaches. She also experiences muscle pain and weakness throughout her entire body; constipation; exhaustion; and intolerance to cold weather. When Plaintiff lies flat on her back, her thyroid condition causes her to cough and choke to the extent that she feels unable to breathe. (Pl. Resp. Ex. A, 90:4-18). In December 2007, Plaintiff was told that the nodules on her thyroid were potentially cancerous (Id. at 127:23-

---

[2] At times Plaintiff instead took Atrovent, which she describes as a "form" and "brand name" of albuterol. (Pl.'s Resp. Ex. A, 126:6-9).

128:2). However, these nodules were eventually determined to be benign. (Id. at 69:16-70:12; 121:6-7)

Plaintiff does not take prescribed medication for her thyroid condition; however, she monitors her condition with bi-annual blood testing and periodic ultrasounds. Also, on one occasion, Plaintiff was taken to the emergency room because of vomiting and given a medication (Reglan or Compazine) that is often given to cancer patients. (Id. at 92:3-93:19).

The parties dispute the impact of these impairments on Plaintiff's attendance history. According to Plaintiff, Defendants did not provide her with any sick or personal days. Defendants do not provide their employees with any written policies about absenteeism or medical leave, or harassment and discrimination in the workplace. While Plaintiff could call in sick, her employers would complain about it when she did. Plaintiff claims that her thyroid condition requires frequent doctor visits. In the course of her employment with Defendants, Plaintiff claims she missed ten to fifteen days of work as a result of her thyroid disorder, her asthma and her anxiety. (Id. at 95:16-96:14). However, Defendants assert that prior to July 7, 2008, Plaintiff missed work ten times and only four of those absences related to an alleged illness. Defendants also portray Plaintiff as habitually tardy to work, claiming she was late

and/or left work early on seven occasions, with only two of these occasions attributable to her health ailments. (Defs. Mot, ¶14).

The parties further dispute whether Plaintiff was able to perform all of her basic functions, including working, despite these conditions. Plaintiff maintains that her health ailments affected her daily activities. However, she also states that she "still can function just like any normal human being," "can get [her] job done," and is "able to take care of [her] kids," "her household," and herself. (Pl.'s Resp. Ex. A, 134:19-135:15).

**Alleged Discriminatory Actions by Defendants**

Plaintiff and Defendants agree that on July 7, 2008 all attended a common meeting to discuss Plaintiff's work performance, and that during this meeting Plaintiff informed Defendants that she may have cancer. However, that is the extent of their agreement; each party has vastly different accounts of the purpose and substance of this meeting.

Defendants—Davis, Sr., Davis, Jr. and Bach—claim that they arranged the meeting with Plaintiff to inform her that they were terminating her employment for poor attendance and performance. Before Defendants terminated Plaintiff as planned, she informed them that she may have cancer. Defendants decided they would not proceed with their plan to fire Plaintiff. (Defs. Mot. Ex. B, 43:6-44:7, Ex. C, 83:9-84:12). Davis, Sr. suggested that Plaintiff join Defendants' health insurance plan so that she

6

would have coverage for any treatments she might need. To defray the costs of this medical insurance, Defendants increased Plaintiff's salary $3.00 per hour. Defendants acknowledge that Plaintiff informed them she might need some time off in the future; however, Defendants deny that Plaintiff asked for any accommodations during the meeting or at anytime afterward.

Plaintiff maintains that the purpose of this meeting was to discuss the status of the company in general, including how they were trying to acquire more clientele. (Pl.'s Resp. Ex. A, 105). According to her, at this meeting Bach commended her work performance and gave her a merited $3.00 per hour salary raise. In the course of this meeting, Davis, Jr. did ask about her absences from work; she had previously informed Bach, her direct supervisor, that these absences were due to medical appointments. Plaintiff then disclosed the possibility that she may have cancer. Following this disclosure, Plaintiff describes Defendants as appearing "stunned" and that the room remained silent for a substantial amount of time. (Id. at 108:13-109:2). Then Bach said they were sorry to hear about her condition. (Id. at 109:3-10). At some point Davis Sr. asked: "Why didn't you say something about this?" (Id. at 107:7-10). Davis, Jr. asked Plaintiff whether she would be able to perform her job given her medical condition. (Id. at 109:16-110:1) She informed her employers that she would occasionally need time off for her thyroid condition

though she did not list specific dates. Following the July 7th meeting, Plaintiff took off one day of work, on September 9, 2008, for a medical issue.[3]

Plaintiff admits that during the July 7th meeting Defendants offered her health insurance benefits, but that she informed them that she was in the process of getting Medical Assistance. Davis, Sr. suggested that Plaintiff go on the company health insurance plan in the interim; Plaintiff paid out of pocket for this insurance. Plaintiff felt based on Davis, Jr.'s demeanor that he was going to let her go as a result of her disclosure.

On October 15, 2008, Davis, Jr., without the other Defendants present, terminated Plaintiff's employment. He told Plaintiff at that time that the company was letting her go due to the bad economy. (Pl.'s Resp. Ex. A, 153:2-10). Although Plaintiff pointed out that the company had just given her a raise, nothing more was said. (Id. at 153:11-15). She left Davis, Jr.'s office and then immediately passed out. Her employers called an ambulance for assistance, but Plaintiff was alert by the time the ambulance arrived and refused to go to the hospital.

---

[3] The record is unclear as to whether Plaintiff took additional time off, and if so, for what reasons. Defendants maintain that she was absent for non-medical reasons on 8/29/08 and 10/2/08. (Pl.'s Resp. Ex. A, 182:14-187:2). Plaintiff herself does not claim that these absences were due to requested medical leave. In fact, she testified that she does not recall why she was absent from work on these dates. (Id. at 183:11-184:10, 186:21-187:2). Plaintiff provides no evidence of any specific requests for leave on account of her medical ailments (other than her absence on Sept. 9th) following the July 7th meeting with her employers.

**PROCEDURAL HISTORY**

Plaintiff filed a charge of discrimination against Defendants on or around April 30, 2009 with the Equal Employment Opportunity Commission ("EEOC"),[4] charging Defendants with firing her because of significant health problems and in retaliation for requesting an accommodation of time off from work occasionally to manage these health problems. (See Defs' Mot. Ex. D at 23:21-24:7, Exs. 1 and 2). On June 28, 2010, Plaintiff filed a complaint in this Court to redress alleged violations of the Americans with Disabilities Act ("ADA") and the Pennsylvania Human Relations Act ("PHRA")(See Doc. No. 1).

On April 11, 2011, Defendants filed their Motion for Summary Judgment. (See Doc. No. 20). Defendants acknowledge that Plaintiff has asthma, anxiety and a multi-nodular goiter. However, Defendants argue that none of these conditions constitute a "disability" under the ADA because they do not substantially limit any major life activity.[5] Thus, Plaintiff is not a qualified individual under the ADA and cannot, as a matter of law, pursue her claims against Defendants.

---

[4] In her response, Plaintiff maintains that she timely asserted her ADA claim before the EEOC, but acknowledges that her PHRA claim was not cross-filed with the Pennsylvania Human Relations Commission ("PHRC") within the 180-day deadline. Thus, she withdraws her PHRA claim. (See Pl.'s Response).

[5] Defendants also argue that Plaintiff "attributes [their] alleged discriminatory animus to her goiter" alone, and that Plaintiff "concedes that neither her asthma nor her anxiety in any way limited her ability to perform any daily activity." (Defs' Mot. at 9). Plaintiff denies this. We will consider the effect of each of Plaintiff's ailments individually as well as collectively.

9

Plaintiff, in turn, maintains that her thyroid condition, asthma and anxiety are impairments that—collectively or individually—substantially limited her ability to work and to breath, both major life activities. (See Pl's Response, Doc. No. 22).[6] Thus, she does qualify for protection under the ADA.

## STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law. Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). In conducting our review, we view the record in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. Bowers v. Nat'l Collegiate Athletic Ass'n, 475 F.3d 524, 535 (3d Cir. 2007); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, the non-moving party cannot rely on "bare assertions, conclusory allegations or suspicions to show the existence of a genuine

---

[6] We cite generally to Plaintiff's Response throughout this opinion because her response lacks pagination.

10

issue." <u>Podobnik v. U.S. Postal Serv.</u>, 409 F. 3d 584, 594 (3d Cir. 2005). When the non-moving party is the plaintiff, she must "make a showing sufficient to establish the existence of [every] element essential to [her] case and on which [she] will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

## DISCUSSION

As a preliminary matter, we apply the legal standard that existed before the Americans with Disabilities Amendments Act of 2008 ("ADAAA") because the alleged discrimination against Plaintiff occurred on October 15, 2008, prior to the Act's January 1, 2009 effective date.  <u>See</u> Pub. L. No. 110-325, 122 Stat. 3553 (2008). The Third Circuit determined that the ADAAA cannot be applied retroactively. <u>Britting v. Secretary, Dept of Veterans Affairs</u>, 409 Fed. Appx. 566, 569 (3d Cir. 2011). Thus, we must apply the narrower interpretation of "disability" that was in effect at the time of Plaintiff's termination. <u>See Toyota Motor Mfg., Ky., Inc. v. Williams</u>, 534 U.S. 184, 197 (2002).

**Pre-ADAAA Legal Standard**

Title I of the Americans with Disabilities Act ("ADA") prohibits covered employers from discriminating against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee

compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a)(1990), *amended by* 42 U.S.C. § 12112(a)(2008).[7]

We employ the *McDonnell Douglas* burden-shifting analysis paradigm when analyzing claims of discrimination on the basis of disability. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999). First, Plaintiff must establish a *prima facie* case of discrimination. Once Plaintiff puts forth a *prima facie* showing, then the burden shifts to Defendant-Employers "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." McDonnell Douglas, 411 U.S. at 802. If Defendants fulfill this burden of production, then the burden shifts back to Plaintiff to prove that the reasons offered by the Defendants were merely pretext. Id.

In order to establish a *prima facie* case, Plaintiff must establish that she is a qualified individual with a disability within the meaning of the ADA, and that she has suffered an adverse employment action as a result of her disability. Turner v. Hershey Chocolate U.S., 440 F.3d 604, 611 (3d Cir. 2006). A "qualified individual with a disability" is defined by the ADA as a person with a disability, who, with or without reasonable accommodation, can perform the essential functions of the job.

---

[7] Hereinafter, citations to Title 1 of the ADA, 42 U.S.C. §§ 12111 et seq., refer to the version of the statute prior to the 2008 amendments.

42 U.S.C. § 12111(8); <u>U.S. Airways, Inc. v. Barnett</u>, 535 U.S. 391, 412-13 (2002). A person can be considered "disabled" in one of three ways: first, if she has "a physical or mental impairment that substantially limits [a] major life activit[y];" second, if she has "a record of such an impairment;" or third, if she is "regarded as having such an impairment." 42 U.S.C. §12102(2).

    We turn first to the question of whether Plaintiff meets the ADA definition of "disability," and thus qualifies for protection under the Act. "The determination of whether one is or is not disabled within the meaning of the ADA is an individualized one to be made on a case-by-case basis," and "is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual." <u>Bley v. Bristol Twp. Sch. Dist.</u>, 2006 U.S. Dist. LEXIS 3113 at *13-14 (E.D. Pa. Jan. 25, 2006); <u>Sutton v. United Air Lines, Inc.</u>, 527 U.S. 471, 483 (1999). An individual must do more than "merely submit evidence of a medical diagnosis of an impairment." <u>Toyota Motor Mfg.</u>, 534 U.S. at 198. The ADA requires those claiming the Act's protection to demonstrate that their impairment causes them to suffer substantial limitations in their own daily experiences. <u>Id.</u>; <u>See</u> <u>Fiscus v. Wal-Mart Stores, Inc.</u>, 385 F.3d 378, 382 (3d Cir. 2004).

    To be "substantially limited" an individual with a disability must be "unable to perform a major life activity that

the average person in the general population can perform," or must be " significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform the same major life activity." 29 C.F.R. §§ 1630.2(j)(1)(i)-(ii). When determining whether an individual is substantially limited in a major life activity, we consider several factors: (i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and, (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment. 29 C.F.R. § 1630.2(j)(2). Under pre-ADAAA law, we also must take into consideration any mitigating measures when assessing whether an impairment "substantially limits" a major life activity. Sutton, 527 U.S. at 475. That is, Plaintiff will only be considered disabled if her impairment substantially limits a major life activity even when she is using mitigating measures, such as medications or devices, to control the impairment.

Plaintiff asserts that "[i]t cannot be disputed that [her] thyroid condition, asthma and anxiety affected her breathing and working." Pl. Resp. We do not dispute this. However, Plaintiff must demonstrate that these conditions *substantially limited* her

breathing and/or working, and she must do so within the stringent interpretation that pre-dated the ADAAA.

Instead of outlining an argument to this effect, Plaintiff reiterates the description of her ailments in her Response and argues that the question of whether these together constitute a "disability" under the ADA is a factual issue that must be resolved by a jury. However, at the summary judgment stage, Plaintiff must demonstrate a material issue of fact such that a reasonable juror could determine her ailments meet the <u>legal</u> definition of "disability." Thus, we evaluate the extent to which Plaintiff's ailments limited her breathing and working in turn, noting that she need only show that she is substantially limited in one of these major life activities for her impairment to constitute a disability under the ADA.

**(1) <u>Plaintiff is Not Substantially Limited in the Major Life Activity of Breathing</u>.**

Breathing is a major life activity under the ADA. 29 C.F.R. §1630.2. "Medical conditions that inhibit breathing, such as asthma or reactive airway disease, may constitute disabilities under the ADA if they severely impair an individual's respiratory capacity as compared to an average person in the general population." <u>Adams v. Pennsylvania</u>, 2009 U.S. Dist. LEXIS 76322 at *20 (M.D. Pa. Aug. 25, 2009); <u>see</u> 29 C.F.R. §1630.2(j)(1). While there is no bright line rule for when the plaintiff's ability to breath more severely impaired than the average person,

15

ADA protections are not usually triggered unless the ailments are so debilitating that they limit the ability to hold a conversation or move about freely even when the plaintiff takes available, mitigating medications. Gallagher v. Sunrise Assisted Living of Haverford, 268 F. Supp. 2d 436, 441 (E.D. Pa. 2003). Plaintiffs have surmounted summary judgment on the grounds that their asthma and/or other chronic health conditions substantially limit their ability to breath when they have shown the need for "continued vigilance to prevent debilitating attacks" or to completely avoid exposure to often unavoidable triggers, such as perfume, household chemicals, car exhaust, smoke or dust. Adams, 2009 U.S. Dist. LEXIS 76322 at *20; see, e.g., Kaufmann v. GMAC Mortg. Corp., 2006 U.S. Dist. LEXIS 30615 (E.D. Pa. May 17, 2006); Khalil v. Rohm & Haas Co., 2008 U.S. Dist. LEXIS 10169 (E.D. Pa. Feb. 11, 2008). However, in contrast, summary judgment is appropriate "where plaintiffs allege only intermittent breathing difficulties and conditions that are well controlled with medication." Anderson v. Radio One, Inc., 2010 U.S. Dist. LEXIS 99713 at *20 (E.D. Pa. Sept. 21, 2010) (citing Adams, 2009 U.S. Dist. LEXIS 76322 at *21); Amorosi v. Molino, 2009 U.S. Dist LEXIS 23756 at *18 (E.D. Pa. Mar. 19, 2009). This is particularly true where the plaintiff admits that the medications or inhalers used to treat these conditions reduce or remove any limitations

16

that the ailments place on the plaintiff's breathing. See
Gallagher, 268 F. Supp. 2d at 440.

For example, in Adams, the plaintiff was diagnosed with a
tumor in his chest that restricted venous blood flow to his
heart. 2009 U.S. Dist. LEXIS 76322 at *2. The cancerous tumor was
eventually removed, but the plaintiff suffered resulting scarring
in his right lung which caused "reactive airway disease." Id.
This condition "produce[d] asthma-like symptoms, including
shortness of breath, tightness in the chest and wheezing." Id. at
*2-3. He was prescribed an albuterol inhaler and received steroid
injections to help increase his breathing capabilities, but these
treatments produced only marginal gains. Id. at *6. Still, the
court determined that the plaintiff was not substantially limited
in the major life activity of breathing because the condition did
"not prevent him from walking, speaking, or climbing a flight of
stairs." Id. at *22-23. Though his condition remained permanent,
it was unlikely to become more severe over time. Id.

Plaintiff controls both her asthma and anxiety with
prescribed inhalers, medications and other treatments. There is
no evidence that her breathing is severely restricted when she is
using these treatments. When asked how her anxiety impacts her
daily activities, Plaintiff testified: "It's controlled. I mean,
if there's a need to take the medication I do, but my daily
activities doesn't change." (Pl.'s Resp. Ex. A, 95:11-15). When

17

asked the same question about her asthma, Plaintiff responded: "I still can perform my basic functions" and "continue to do my daily duties." (Id. at 94:5-8, 95:3-5). "Any effect that Plaintiff's anxiety has on her daily life is controlled by medication." (Pl's Resp.)[8] Even though Plaintiff's asthma and anxiety are chronic conditions, these conditions appear stable and unlikely to worsen over time. Plaintiff has made no showing that these conditions impede her mobility or ability to converse. In their present manifestation and with regular medication, these conditions do not require the kind of heightened vigilance that shows a substantial limitation on the ability to breath.

We also do not believe that a reasonable juror could find that Plaintiff's thyroid condition severely restricts her breathing ability based on the evidentiary record before us. While there is a concern that Plaintiff might develop cancerous nodules in the future, that concern seems to arise out of precaution rather than prediction. Plaintiff offers no evidence to suggest that she expects the long term impact of her thyroid condition to be a severe restriction on her ability to breath. There is no medical evidence or opinion that this is the nature

---

[8] We note that Plaintiff offers only her own descriptions of her impairments as evidence. She presents no medical evidence concerning the nature, severity, duration or impact of her asthma, anxiety, and thyroid condition. While such evidence is not required to sustain a claim of disability under the ADA, its absence favors defendants' position and impacts our ability to discern the alleged limitations on Plaintiff's breathing from her ailments. See Marinelli v. City of Erie, 216 F.3d 354, 360-61 (3d Cir. 2000); Anderson, 2010 U.S. Dist. LEXIS 99713 at n.4.

of the condition or the expected outcome for Plaintiff in particular. We know only that her doctors suggested she undergo a needle biopsy to be certain that her nodules were not cancerous, and that by Plaintiff's own admission her nodules are benign. (Pl.'s Resp. Ex. A, 69:16-70:12, 121:6-7). Plaintiff's only argument is that her thyroid condition causes her to choke and cough when lying down on her back:

> Q. Do you have any other problems breathing with the goiter?
>
> A: It just feels like a real big fullness in my neck.
>
> Q. Does it impact your ability to breathe in any way other than when you're lying down?
>
> A. No, that's it. (Id. at 90:19-91:1).

Even in the light most favorable to Plaintiff, this interference with her ability to breath cannot be deemed a "substantial limitation" within the meaning of the ADA.

## (2) Plaintiff is Not Substantially Limited in the Major Life Activity of Working.

"As applied to the major life activity of 'working,' the term *substantially limits* refers to a significantly restricted performance ability with regard to either a particular type of job or a wide range of job types as compared to the average person having similar training, skills, and abilities." 29 C.F.R. § 1630.3(j)(3)(I); Tice v. Ctr. Area Transp. Auth., 247 F.3d 506, 512 (3d Cir. 2001).

There does not appear any factual support from which a jury could reasonably infer that Plaintiff's thyroid condition, asthma and/or anxiety substantially limit her ability to work. Plaintiff herself attests that she "can still perform a job, but there may be a few times here and there that it's caused [her] to not be able to work." (Pl.'s Resp. Ex. A at 95:16-20). She further attests: "I still work. I have no problems."(Id. at 96). And later:

> Q. What impact does your thyroid condition have on your daily activities?
>
> A. None. I still can function just like any normal human being. I can get my job done.
>
> Q. And it doesn't impact you in any way?
>
> A. There may be times when the symptoms do bother me, but other than that I can perform my work duties just like anybody else. (Id. at 134:22-135:5).

Even if we assume Plaintiff missed ten to fifteen days of work as an employee for Defendants on account of her health conditions, this is not enough to constitute "a significantly restricted performance ability." See Bianco v. GMAC Mortg. Corp., 2008 U.S. Dist. LEXIS 96157 at *14-15 (E.D. Pa. Nov. 25, 2008).

**(3) Plaintiff Does Not Have a "Record of" Disability.**

Although Defendants were aware of Plaintiff's self-description of her ailments, Plaintiff never presented Defendants with documentation. See Khalil, 2008 U.S. Dist. LEXIS 10169 at 34. "Mere knowledge of an impairment does not create a record of

20

an impairment." Id. Moreover, even if there were a record of
Plaintiff's impairments, these impairments must constitute a
disability within the meaning of the ADA. As discussed above,
they do not. Plaintiff's "record of" claim fails because
Plaintiff has not demonstrated a substantial limitation in a
major life activity. See Tice, 247 F.3d 513; McGee v. P&G
Distrib. Co., 445 F. Supp. 2d 481, 489 (E.D. Pa. 2006).

**(4) Plaintiff Cannot Make Out a "Regarded As" Claim.**

Plaintiff's failure to establish that she is substantially
limited in a major life activity is not fatal to her "regarded
as" claim. See Fulton v. Johnson & Johnson Pharm. Research &
Dev., LLC, 2008 U.S. Dist. LEXIS 14163 at *29-30 (D.N.J. Feb. 26,
2008). Under this prong, an employee has a qualifying
"disability" if: (1) she has a physical or mental impairment that
does not substantially limit major life activities but is treated
by the covered entity as constituting such impairment; (2) she
has a physical or mental impairment that substantially limits
major life activities only as a result of the attitudes of others
toward such impairment; or (3) she has no such impairment but is
treated by a covered entity as having a substantially limiting
impairment. 29 C.F.R. §1630.2(l); Taylor v. Pathmark Stores,
Inc., 177 F.3d 180, 187 (3d Cir. 1999); Tice, 247 F.3d at 514
(citing Sutton, 527 U.S. at 489). When evaluating whether an
employee was "regarded as" disabled under the ADA, we focus on

21

the reactions, perceptions and conduct of the employers, not the employee's actual abilities. Heebner v. Nationwide Mut. Ins. Co., 2003 U.S. Dist. LEXIS 19569 at *15 (E.D. Pa. Sept. 30, 2003). "[E]ven an innocent misperception based on nothing more than a simple mistake of fact as to the severity, or even the very existence, of an individual's impairment can be sufficient to satisfy the statutory definition of a perceived disability." Deane v. Pocono Med. Ctr., 142 F.3d 138, 144 (3d Cir. 1998); see also Taylor, 177 F.3d at 182. However, the plaintiff must show that her employer had such a misperception. "Mere knowledge of an employee's impairment is not enough, because anyone could prove a prima facie case of employment discrimination merely by showing adverse action against the individual and that the employer was aware of the employee's disability." Heebner, 2003 U.S. Dist. LEXIS 19569 at *15; Kelly v. Drexel Univ., 94 F.3d 102, 109 (3d Cir. 1996).

Plaintiff identifies two comments by her employers that she feels evidence their animus toward her on the basis of her disability. First, Davis, Jr.'s inquiry at the July 2008 meeting into whether she could perform her job given her potentially cancerous thyroid condition. (Pl's Resp. Ex. A, 9:10-10:9, 18:19-23, 147:16-24). She claims this question did not arise from concern since he "got loud with the whole situation." (Id. at 148:10-24). Second, his comment after she was terminated, and

subsequently blacked out: "[Y]ou don't need to worry about your job, you need to worry about getting your health together." (<u>Id</u>. at 147: 20-24). Plaintiff also points out that her employers knew she would need to take off more time in the future for her medical conditions.

At most, this shows that Plaintiff's employers knew of her health conditions, and that these conditions could potentially impact Plaintiff's job performance. This is not enough to suggest that any of the Defendants perceived Plaintiff as incapable of or substantially limited in performing her job because of her health. Furthermore, "[t]o prevail in [her] 'regarded as disabled' argument, plaintiff would have to show that [her] employer misinterpreted information about [her] limitations to conclude that [she] was unable to perform a 'wide range or class of jobs.'" <u>Keyes v. Catholic Charities of the Archdiocese of Phila.</u>, 415 Fed. Appx. 405, 410 (3d Cir. 2011). "An employer who simply, and erroneously, believes that a person is incapable of performing a *particular* job will not be liable under the ADA." <u>Taylor</u>, 177 F.3d at 192(emphasis added). Plaintiff has not provided any evidence that her employers perceived her as unable to work in general, or in performing a large range of jobs. <u>See</u> <u>Marinelli</u>, 216 F. 3d at 364.

**(5) <u>Plaintiff Does Not Have a Retaliation Claim Under the ADA</u>.**

Plaintiff further maintains that her employers retaliated

against her for seeking reasonable accommodations for her ailments. Under the ADA anti-retaliation provision, an employer is prohibited from taking adverse employment action against an employee in retaliation for the employee's protected activity. See 42 U.S.C. §12203(a). To prevail in a retaliation claim, the employee must show that: (1) she engaged in a protected activity; (2) she suffered an adverse employment action after or contemporaneous with her protected activity; and (3) a causal connection exists between her protected activity and the employer's adverse action. Fogleman v. Mercy Hosp., 283 F.3d 561, 567-68 (3d Cir. 2002). "Protected discrimination under the ADA includes retaliation against an employee for requesting an accommodation." Sulima v. Tobyhanna Army Depot, 602 F.3d 177, 188 (3d Cir. 2010).

A reasonable juror could conclude that Plaintiff engaged in a protected activity when she informed her employers she "would need time off here and there for treatment and doctors' appointments" (Pl.'s Resp. Ex. A, 12:9-14), even though her ailments do not meet the ADA definition of "disability." First, Plaintiff's actions may be construed as a request for accommodation even though she did not specify what and how much time she would need off in the future. Simply informing an employer about a disability, without more, is not enough to have engaged in protected activity under the ADA. Prigge v. Sears

24

Holding Corp., 2010 U.S. Dist. LEXIS 69022 at 25-26 (E.D. Pa.
July 9, 2010). However, the employee's request "does not have to
be in writing, be made by the employee, or formally invoke the
words 'reasonable accommodation" as long as the employer knows of
both the disability and the employee's desire for accommodation.
Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 313 (3d Cir.
1999). Here, Plaintiff did more than relay a diagnosis to her
employers. Inferring from the facts in the light most favorable
to Plaintiff, we must find that Plaintiff informed Defendants
that she would need time off in the future for her health
ailments, in particular referring to appointments for her thyroid
condition. Second, "[u]nlike a claim for discrimination under the
ADA, an ADA retaliation claim based upon an employee having
requested an accommodation does not require that a plaintiff show
that he or she is 'disabled' within the meaning of the ADA...[A]
plaintiff need only show that she had a reasonable, good faith
belief that she was entitled to request the reasonable
accommodation she requested." Williams v. Phila. Hous. Auth.
Police Dep't, 380 F.3d 751, 759 n.2 (3d Cir. 2004) (citing
Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 191 (3d Cir.
2003). A reasonable juror could infer that Plaintiff made her
request with the good faith belief that time off was necessary
and appropriate.

　　　We assume *arguendo* that Plaintiff engaged in a protected

activity under the ADA when she explained her health conditions
at the July 7th meeting and requested time off in the future, and
we acknowledge that her termination constitutes an adverse
employment action that occurred after this request. Yet, she has
failed to provide sufficient evidence establishing that her
termination, 15 weeks after her accommodations request, was a
retaliatory decision.[9] In ADA retaliation claims, "temporal
proximity between the protected activity and the termination can
be itself sufficient to establish a causal link. However, the
timing of the alleged retaliatory action must be unusually
suggestive of retaliatory motive before a causal link will be
inferred." Williams, 380 F.3d at 760 (quoting Shellenberger, 318
F.3d at 183, 189 n.9)(internal quotation marks omitted). When
more than two months elapses between the request for an
accommodation and the date of termination, the temporal proximity
is not so close as to be unduly suggestive, and the plaintiff
must put forth other evidence to demonstrate a causal link.
Williams, 380 F.3d at 760; see also Hemby-Grubb v. Ind. Univ. of

---

[9] Plaintiff muddles the issues for a retaliation claim. For example, she
argues that her employers did not accommodate her because she was not given a
set quantity of personal or sick days. (Pl's Resp.). Plaintiff also argues
that her employers failed to engage in the interactive process required by the
ADA because they did not question her reasons for taking sick time off before
the July 7th meeting. (Id.). Neither of these arguments support Plaintiff's
retaliation claim. Rather, Plaintiff seems to state a claim for retaliation in
form, but in substance sets forth a claim for failure to accommodate her
request. Plaintiff cannot hinge her retaliation claim on Defendants' failure
to provide reasonable accommodations (even if she could establish such a
failure) because, as discussed at length infra, Defendants had no such
obligation. Plaintiff does not suffer a qualifying disability.

Pennsylvania, 2008 U.S. Dist. LEXIS 72481 at *25 (W.D. Pa. Sept. 22, 2008)(citing Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280 (3d Cir. 2000)). Here, the timing of the termination–nearly four months after the protected activity–is not enough evidence, by itself, to show causation.[10] Even viewing the record in the light most favorable to Plaintiff, there is no additional evidence from which a reasonable juror could conclude that Plaintiff was terminated *because* of her request for accommodations.

## CONCLUSION

Plaintiff has not made out a *prima facie* case of disability discrimination or retaliation under the governing pre-ADAAA standard.[11] Accordingly, we grant Defendants' Motion for Summary Judgment.

---

[10] Plaintiff fixates on how she made repeated requests for time off before the July 7th meeting. We do not need to delve further into an analysis of any such requests. The only adverse employment action alleged is Plaintiff's termination on October 15th. The time lapse between July 7th and October 15th is too long to give rise to an inference of causation; the lapse between any actions before July 7th and the termination is even more extensive and likewise prevents us from inferring retaliation. Furthermore, in Plaintiff's own words the July 7th disclosure was the relevant event that sparked the alleged retaliation by her employers: "I was never reprimanded. I never had poor work experience...And everything started happening after I disclosed that I had a medical condition." (Pl.'s Resp. Ex. A, 147:6-10).

[11] In their respective pleadings, Plaintiff and Defendants make several additional arguments. Defendants argue that they have proffered a legitimate, non-discriminatory reason for terminating Plaintiff. Plaintiff argues she has demonstrated that the reasons offered by her employers are mere pretext. She further argues that Defendants are estopped from asserting that Plaintiff was fired for her poor performance given their testimony to the contrary before the EEOC. Because we find that Plaintiff cannot make out a prima facie case of disability discrimination or retaliation under the governing pre-ADAAA standard, we refrain from discussing any of these arguments.